## CONSTRUCTION OF WILL CONTAINING EXECUTORY DEVISES PLACING LIMITATIONS ON FUTURE INTERESTS.

Common Pleas Court of Franklin County.

JOHN WESTWATER, ADMINISTRATOR DE BONIS NON WITH WILL AN-
NEXED OF JAMES M. WESTWATER, DECEASED, v. ELLA J.
GUITNER ET AL.

Decided, October Term, 1915.

*Wills—Devising Clause Construed in the Light of the Trust Created by
Other Clauses—Quit-Claim Deeds and Written Transfers by Devi-
sees—Ineffectual to Convey the Estates Covered Thereby—Effect
of Such Conveyances when Treated in the Light of Equitable Con-
tracts—Relief Not Barred by Estoppel or Laches.*

Where by the will of a testator he devises to his wife for her use dur-
ing life his residence, and to his two daughters he bequeaths the
rents on another of his three parcels of real estate, of which he
died seized; his son David was appointed executor, and he was
required by said will to take charge and care of all the property
of the testator, including a store consisting of a stock of queens-
ware and other related goods; to pay the taxes and assessments
thereon, and collect the rents on the one parcel; to continue the
store business as long as it was profitable and until the death of
his widow; to pay the rents on the one parcel to the two daughters,
thirty dollars a week to his widow, and a salary to himself of
$2,000 a year; to invest and re-invest moneys belonging to the
estate, including the profits from the store business, in notes se-
cured by real estate mortgages, improved real estate or in United
States bonds; to take an invoice of the stock in the store during
the first year, keep careful books of account of the store busi-
ness and put the invoice and accounting in writing and preserve
the same; to use all his time, best skill and endeavor to make
the store business profitable and prosperous; at the death of his
widow to settle up the estate and make the distribution as there-
inafter provided, and to that end he was authorized and empowered
to sell any or all the real estate either at public or private sale at
such price as he deemed sufficient, adequate and proper, to con-
vert all personal goods and chattels into money, and to make, ex-

ecute and deliver all deeds or other instruments of writing necessary to properly convey any part thereof; explaining and defining the "distribution" · which the executor-trustee was to make; by the eighth item of the will the testator gave, devised and bequeathed, after the death of his wife, all his estate, real and personal and mixed, to his six children, their heirs or assigns, in equal shares and portions; and in the event of the death of any of said children before receiving his or her share, leaving no issue of his or her body living, the share of the one so dying should go to the brothers and sisters surviving, their heirs or assigns, in equal shares and portions *per stirpes* and not *per capita;* in the distribution each of the children are to be charged with the advancements made to them by the testator, without interest; before the death of the widow the executor-trustee for himself and other children, made an alleged purchase of the right, title and interest of one of the sons (Robert) who died before the said widow died, leaving children who are defendants to the action taking from him and his wife a quit-claim deed and unacknowledged written transfers of all his right, title and interest in the estate of his father, the consideration therefor being an advancement of $5,350 made to him by his father in his lifetime, and $19,955 in money paid out of the estate's assets; and said executor-trustee also, before the death of the said widow, for himself and other children, made an alleged purchase of the right, title and interest of another son, (James) who is still living, taking from him a quit-claim deed and an unacknowledged written transfer, the alleged consideration for said deed and transfer being an advancement of $25,299.70 made to him by his father in his lifetime, and a quit-claim deed from said executor-trustee and the other children, for whom he was acting, releasing to said James their right, title and interest in another parcel of real estate of which the testator died seized, but into possession of which he had placed the said James during his lifetime; before the death of the said widow the said executor-trustee departed this life intestate, and leaving no issue of his body.—*Held:*

(*a*). The devising clause in the will though in the apparant form of general grant seemingly showing intent to pass remainder in fee, does not because a clear and unequivocal trust is created in other clauses which discloses a paramount purpose, the interest devised to the children being by way of distribution in the final proceeds from the accumulations and the proceeds of real estate to be sold on death of widow, the distributive interest passing to the children being contingent upon survivorship, the number and names of the beneficiaries being uncertain at the death of the testator, and contingent upon death, survivorship and issue.

($b$). The interests which thus pass by the will to the children, their heirs and survivors, being thus contingent upon death, survivorship, and birth of issue, and governed by *per stirpes* method of distribution, it follows that the interests are wholly contingent and do not become fixed and vested until the death of the widow.

($c$). The will did not fix the names of all the beneficiaries, and the time and condition upon which the devise is made is annexed to the substance of the gift, and the vesting thereof being contingent upon future events and conditions, the devise falls within the class of executory devises, as distinguished from executory interests.

($d$). Executory devises being instituted to support and effectuate the intention of a testator concerning limitations in future interests or estates, which may not take effect as a remainder or other kind of testamentary interest, consistently with law, it follows that such devise must be indestructible by any act of the owner of preceding contingent interest as by alienation, for that would be to defeat the purpose of the will.

($e$). Hence it follows an executory devise can not by contract, deed, or will be transferred by the contingent devisee, so as to defeat the intent and purpose of the will, by depriving those who survive the death of the widow and the issue of any beneficiary who deceases before the happening of the contingent event of their distributive interest.

($f$). That the said quit-claim deeds and written transfers of Robert and James Westwater did not convey and transfer their interest or estates in their father's estate to the grantees therein named;

($g$). That the said purchases made by the said executor-trustee for himself and others from James and Robert, having been made by a trustee with power to sell, can not be enforced in equity against his *cestui que trustent* James and the children of Robert, deceased; and it is immaterial whether the said James and Robert did or did not receive full value for their interests in their father's estate;

($h$). That the children of the said Robert, deceased, are entitled to their father's share of his father's estate minus the advancement made to the said Robert by his said father in his lifetime, and to their father's share of the son David's share of his father's estate;

($i$). That the said son James is entitled to have his share of his father's estate and also his share of the estate of David in his father's estate, the former to be subject to a deduction of advancements made to him by his father;

($j$). That neither the children of Robert nor James are barred of the relief to which they are entitled by either estoppel or laches;

($k$), That the title to the estate of the testator vested in the executor-trustee.

KINKEAD, J.

This action is brought to obtain a construction of a will. James M. Westwater died testate February 26th, 1894. He left Rosean Westwater, his widow, and the following children, James Westwater, Robert Westwater, David Westwater, John Westwater, Carrie M. Hughes (now a widow), and Ella J. Guitner (now a widow). Robert is dead and left a widow and the following children: James H., Robert E., Frederick B., Rogers and Donald, all of whom are of age.

David Westwater was appointed executor and acted as such until his death July 28th, 1912.

The following are the essential portions of the will involved in the controversy:

The homestead and its contents was given to the widow for life.

"Further, I do hereby authorize and empower and direct my executor    *    *    *    out of my estate to pay to my said wife the sum of thirty ($30) per week, payable to her weekly, for and during the term of her natural life, for her maintenance and support.

"Item: I give, devise and bequeath unto my two daughters, Ella Jane Westwater and Carrie Westwater, share and share alike, all the rents and profits of what is known as my Kerr North Graveyard property for and during the natural life of my wife, and the amounts so received by them for their maintenance and support shall not be treated or considered as advancement to them or deducted from their distributive share respectively in my estate on a final settlement thereof.

"Item:    I do hereby nominate and appoint my son, David Westwater, to be the executor of this my last will and testament and request that he be not required to give bond or other security for the faithful performance of his duties as such executor.    I further request that there be no inventory or appraisement of my estate and effects as required by law in estates of intestates.

"I further desire that the crockery and queensware business carried on and conducted by me at 93 South High street, Columbus, Ohio, shall, after my decease, be carried on and conducted at the same place by my son, David Westwater, for and during the term of the natural life of my said wife.

"My said son David shall devote his entire time, best skill and endeavor to make said business profitable, and in the man-

agement and care of my estate, and for such services and for his services as executor hereunder, he shall receive and be paid out of my estate a salary of two thousand dollars ($2,000) per year and no more.

"Careful books of account shall be kept and an invoice of stock shall be taken during the first year after my decease, which invoice and accounting of stock shall be put in writing and preserved.

"Should said business, at any time after my decease, and prior to the decease of my wife, become from any cause unprofitable, I hereby clothe my said excutor with full power and authority to close out or sell the same, either at public or private sale, for such price as he may deem for the best interest of my estate; however, it is my wish and desire that said business be carried on and conducted as aforesaid. My said executor shall look after my estate, real and personal, and pay all taxes, assessments and insurance on all my property, including the premises hereinabove devised to my wife, Rosean Westwater, for and during her natural life.

"Until the decease of my wife, my said executor shall invest and re-invest the moneys belonging to my estate, including the profits of said business, if any, and in the event of a sale of said business as above provided for, the proceeds of said sale he shall invest and reinvest in loans upon interest with sufficient mortgage security or in U. S. Government bonds or other interest-paying bonds, or in improved real estate in the city of Columbus, Ohio.

"After the death of my said wife my excutor shall proceed to settle up my estate and make distribution as hereinafter mentioned, and to that end he is hereby authorized and empowered to sell any or all real estate of which I may die seized either at public or private sale for such price and consideration as he may deem full, adequate and proper, and to convert all my personal goods and chattels into money; also to make, execute and deliver any and all necessary deeds or other instruments of writing necessary to properly convey the same or any thereof.

    \*      \*      \*      \*      \*      \*      \*

"Item: After the death of my said wife, Rosean Westwater, I give, devise and bequeath all my estate, real and personal and mixed, of whatsoever name and kind, and wheresoever the same may be laying or situate, unto my children: Robert Westwater, James Westwater, David Westwater, Ella Jane Westwater, Carrie Westwater and John Westwater, their heirs or assigns, in equal shares and portions, share and share alike.

"In the event of the death of any of my children (before receiving his or her share of my estate) leaving no issue of his or her body living, the share of the one so dying shall go to the brothers and sisters surviving their heirs or assigns, in equal shares and portions *per stirpes,* and not *per capita.*

"Should any of my said children be indebted to me at the time of my decease by reason of advancements heretofore made by me to them, or any of them, such indebtedness shall be deducted from their distributive share of my estate without interest, on a final settlement of my estate."

## 1.    THE QUESTIONS TO BE DECIDED.

The petition presents a number of difficult questions of far-reaching importance. The first naturally to be considered is the right of James Westwater and the heirs of Robert Westwater to question, or make objection to, the acts of administration of the executor, or to claim interest in the estate under the will. Both James and Robert Westwater executed alleged quit-claim deeds and assignments of sale of all their interest in the estate of David Westwater, John Westwater, Ella J. Guitner and Carrie M. Hughes. It is therefore contended by the administrator *de bonis non* that they have no interest in the estate, hence no right to object to the course of administration by the executor or by the present administrator.

## 2.    THE FACTS—INSTRUMENTS OF QUIT-CLAIM AND RELEASE.

On July 7, 1900, Robert Westwater and wife executed a quit-claim deed to James, David and John Westwater, and to Ella J. Guitner and Carrie V. Hughes, releasing to them all their right, title and interest in the real estate belonging to the estate, for one dollar and other considerations.

On the same date Robert Westwater executed two paper writings, by the first of which it is stated that for a sum of money entirely satisfactory to him, he sold, conveyed and transferred all his right, title and interest in the estate of his father to his brothers and sisters, and by the second paper writing, for the sum of "one dollar" and for other valuable considerations, including large sums of money heretofore advanced to him," he

sold, assigned and conveyed to his said three brothers and two sisters all his right, title and interest in and to the estate of his father.

The court finds that Robert had been importuning the executor for money from within a year after his father's death; that the executor went to California in the year 1900, telling no one anything specially about his purpose and intent in respect of Robert's interest, excepting to John, to whom he merely stated that Robert had been asking for money and that he was going out to California and end the matter.

The sum of $5,350 only had previously been advanced to Robert by his father during his lifetime. The report of the executor shows that $19,955.60 was paid to Robert by the executor, David Westwater, out of the moneys of the estate. The "advancements" to Robert by the executor began the first year after death of the testator, as shown by the accounts.

The court finds that David Westwater, alone, without special authority from other heirs, procured the quit-claim deed and the assignment from Robert, by paying him moneys belonging to the estate, which the executor held in trust for the benefit of the beneficiaries who may survive the widow; that neither James, John, Ella J. Guitner nor Mrs. Hughes took any part in the transaction whatsoever. So far as the evidence discloses, no one but John previously knew anything about it. It does not appear that any of the beneficiaries knew anything about the transaction until after it was completed. The court specially finds that James Westwater neither knew before the assignment was made, nor was he made acquainted with the fact before or at the time he himself executed his quit-claim and assignment to the other beneficiaries.

On August 20, 1902, James Westwater executed a quit-claim deed releasing to David Westwater, John Westwater, Ella J. Guitner and Carrie J. Hughes, all his interest in the real estate of his father. The consideration expressed therein was an advancement of $25,299.70 made by James M. Westwater, deceased, to James Westwater, and also a deed from David Westwater, individually, David Westwater, as executor of the estate of

James M. Westwater, Ella J. Guitner, Carrie V. Hughes and John Westwater, by which they released, remised and quit-claimed to him their interest in the Oak street property. The executor, as such, had no right or authority to join in such deed of quit-claim.

On the same day James Westwater signed a paper writing reciting for one dollar and other valuable considerations, includ-ing large sums of money advanced to him, purporting to sell, assign and convey to David and John Westwater, Ella J. Guit-ner and Carrie V. Hughes, all his right, title and interest in the estate of his father. It recited, also, that it was "in full settle-ment of all sums due me or due from me to the said estate."

No personal negotiations concerning the matter were had be-tween James and David; they apparently not being on good terms at the time. David Westwater directed James G. West-water, son of James Westwater, to tell the latter that they— himself, Brother John, and sisters, would deed to him the "Oak street property" if he would quit-claim to them his interest in the realty of the estate and make the assignment.

The fact that Robert had previously assigned his interest to even James himself, as before stated, was not made known to him, nor was anything concerning that transfer made known to James. Affirmative evidence shows that no detailed information concerning the condition of the estate was made known to either Robert or James, at the time of executing the instruments.

The court finds that the Oak street property had been bought more than twenty-five years before by James M. Westwater, with the avowed purpose that it should be the property of his son James; that James occupied it all these years without pay-ing rent, and that he expended money in making permanent and valuable improvements thereon.

The deed by James to his brothers and sisters was not re-corded until April 22, 1910. But the fact of recording it added no value to it.

The account of David Westwater as executor, filed in the probate court, shows "advancements" made to beneficiaries by the testator, and recites certain "advancements" made by the

executor after the decease of James M. Westwater, claiming them to have been made by virtue of an agreement entered into March 19, 1900, by Robert, John, James, and David Westwater, Ella J. Guitner and Carrie M. Hughes authorizing the executor to make advancements and be protected. The "advancements" or payments are specified, and disclose that the $19,555 paid to Robert was paid out of the estate. It appears that David received $20,064.42; John received $19,215.97; Carrie M. Hughes, $14,631.48; Ella J. Guitner, $20,130.25, and James the Oak street property, $6,000. A written agreement was signed by all beneficiaries March 9, 1900, ratifying all advancements previously made to the beneficiaries by the executor.

At the time that Robert and James executed the quit-claim deeds and written assignments of their contingent interest in the estate the widow was living. She did not die until July 15th, 1913.

At the time of such releases, of course, David was living. But he died before his mother did, to-wit, July 28, 1912. He left no issue.

Robert Westwater died April 20, 1912.

The agreement made by all the heirs mentioned in the account of David, as executor, authorizing him to make advancements, was made to ratify advancements previously made without authority. This agreement to make advancements was made March 19, 1900, and the settlement with Robert was made July 7, 1900, while the one with James was made August 20, 1902.

### 3. General Questions Presented.

The foregoing statement of facts relate solely to the formal documents by means of which it is claimed that Robert and James relinquished, transferred or assigned their interests in the estate, under the special circumstances or representations accompanying the same.

Whether the documents were legally sufficient to release or transfer their interests, depends not alone upon the mere instruments themselves, but as well upon the facts, circumstances and the law. The legal effect of the quit-claim deeds and assign-

ments can not be determined without considering first some other questions, viz.:

1. Did they have vested interests which could be conveyed or released by them?

2. If they did, did the fact that the executor purchased the interests out of moneys belonging to the estate for his own benefit, as well as for those for whom he was acting, under the circumstances, render the transaction voidable?

A. To decide this the legal duty of the executor and his performance thereof are to be considered. Did the executor make sufficient, full, legal disclosure of all facts essential to enable the parties to act? Are the beneficiaries, or the representatives thereof, estopped from denying the legal consequence in equity of the instruments by them executed?

### 4. CONSTRUCTION OF THE WILL.

The intent and purpose of the will is clear that the estate was to be kept intact until the widow deceased. The business was to be carried on until that period, unless it proved unprofitable. The moneys of the estate and profits of the business, or proceeds, in event of its sale, were to be invested in loans with sufficient mortgage, or in U. S. Government bonds, or other interest-paying bonds, or in improved real estate. The estate was to thus accumulate and remain *in solido* until the death of the widow. The whole estate was to be held in trust for the purposes specified by the will.

The estate was to be allowed to accumulate, and was to be held in trust. It was to be invested as directed, and not to be advanced to the beneficiaries.

A portion of the money accumulating was to be paid to the widow—$30 per week—and to pay taxes, assessments and insurance on his real estate. The income of the "Kerr North Graveyard property" was to go to the two daughters during the life of the widow, which was not to be treated as an advancement.

The real estate, and all accumulations and investments were to be held in trust by the executor until the death of the widow. When that occurred the executor was authorized to sell any or all real estate of which the deceased was seized, "either at public

or private sale for such price and consideration as he may deem full, adequate and proper, and to convert all * * * personal goods and chattels into money.'' The executor was authorized to make, execute and deliver any and all necessary deeds or other instruments of writing necessary to properly convey the same,'' etc.

Then, and not till then, were the proceeds of his property to be distributed to the beneficiaries or heirs named. At that time, as provided, the will required that the executor ''shall proceed to settle up my estate and *make the distribution as hereinafter mentioned.*''

The clause referred to in the will providing how the money accumulating from the business and from the sale of the real estate was to be *distributed,* is as follows:

''After the death of my said wife, Rosean Westwater, I give, devise and bequeath all my estate, real and personal and mixed, of whatsoever name and kind, and wheresoever the same may be lying or situate, unto my children, Robert Westwater, James Westwater, David Westwater, Ella Jane Westwater, Carrie Westwater, and John Westwater, their heirs or assigns, in equal shares and portions, share and share alike. In the event of the death of any of my children (before receiving his or her share of my estate) leaving no issue of his or her body living, the share of the one so dying shall go to the brothers and sisters surviving, their heirs or assigns, in equal shares and portions *per stirpes,* and not *per capita.*''

It is to be observed that the foregoing clause is in the technical form of a grant, as if it was in disposal of an estate in lands, instead of in the proceeds thereof. The intent of the testator, however, is to be gathered from the whole will; from the general plan thereof. The above clause, taken with the grant of the life interest to the widow, is in the form of a general grant, and seemingly shows an intent, to pass a remainder in fee to the heirs named, their assigns or survivors, after the life estate is ended.

But this is not so, because there is a clear and unequivocal trust provided for in other portions of the will which is the paramount purpose, so far as relates to the children of the tes-

tator. The will provides—in the general plan thereof—that the executor shall take and hold the real estate for the uses and purposes specified. The homestead is to be held for the use and benefit of the widow. The executor is to continue the business for her benefit, to pay therefrom sufficient money for her living and the upkeep of the homestead. The graveyard property is to be held in trust by the executor for the sole use and benefit of the daughters, the income therefrom to be paid to them for support, but not as advancements.

Upon the death of the widow, the executor is required to sell all the real estate, as well as the business, and to distribute all moneys derived therefrom, as well as from the accumulated income and investments, in equal shares and portions, share and share alike to the children named. And if any of the children die without issue, before receiving his share, it shall be distributed to the brothers and sisters surviving and their heirs in equal shares and portions *per stirpes,* and not *per capita.*

We have here language in the apparent form of a pure devise of the fee of realty, specifically parceling out the shares with descriptive terms appropriate to such devises. That is, the separate clause last quoted, considered alone, looking to the technical language, "give, devise and bequeath all my estate, real, personal and mixed, their heirs or assigns, in equal shares and portions, share and share alike," etc., indicates a purpose to bequeath the personalty, and to devise the remainder in fee.

The latter part of the clause, providing for the contingency of the death of one beneficiary without issue living, the share shall go to the brothers and sisters in equal portions *per stirpes,* and not *per capita,* is technical in its import. That is, taken with the whole of the clause, the clear intent is, that the personalty, and the fee of real estate of the one so dying, shall pass to the remainder *per stirpes,* to those living and to the representatives of any who may be deceased. The technical meaning of such language is to pass a vested interest in the fee (according to the fiction of law), as to vesting the remainder in fee on death of testator, as though the actual intent and purpose was to vest the physical estate in the realty.

But it can not be presumed that the technical words standing alone in this clause were used in their technical sense. They can not be given their full, definite, legal signification as if applied to the fee of the land, because there is a clear intention to the contrary apparent from the context. (See 40 Cyc., 1398.) The relation and effect of this clause, succeeding as it does the preceding paramount provisions of the trust created, which, taken with the whole will, discloses an intent on the part of the testator that the fee of the real estate was never intended to pass to and become vested in the beneficiaries. Of course, the provision, so far as it relates to the personalty, is consistent with the whole will. But not so with the provision relating to the real estate.

In this connection, note the language:

"death of any of my children (before receiving his or her share of my estate) leaving no issue," etc.

This shows the non-technical use of an apparent *alleged* "devise" of real estate, because previous parts of the will show that the heirs named were only to receive the proceeds of the sale of the real estate, together with the personalty. The will is so framed that the heirs are not entitled to receive their share until after the death of the widow. Nothing becomes vested in them until that period. So it is impossible from the language of the whole will for the interest in the money and personal securities to have been received until after the death of the widow. So the clause is to be so construed as not to intend that there was to be a technical vesting of a fee, because the testator is presumed to have intended, if any one of the heirs died before the widow's death, that in such contingency the share he intended to give him, if living, would go to the others or their legal representatives *per stirpes*.

Under such construction, David and Robert having died before the widow, by giving effect to the intent of the testator, and by the operation of his will, upon the death of either of them, by force of the non-technical language of the whole will, the interest in the existing personalty and in the expectant proceeds

of the real estate was to be distributed according to the will, and at once the same becomes subject to the bequests of the testator, because the contingency for rendering the provision inoperative as to those who die before the widow, had happened.

If the heir died after the real estate had been sold and the proceeds were in the hands of the executor, but not yet distributed, the funds would become impressed with the provisions of the will, and would, no doubt, become vested, by analogy, to the rule that obtains where an administrator or executor has sold real estate and holds the proceeds.

The language, *"before receiving his or her share of my estate,"* is not technical, and not entirely clear. It can not be considered literally, because it was evidently not meant "before actually getting or receiving the physical possession of his share." It is clear, from the whole will, that it was intended to mean, if one heir died before the death of the widow, the interest would pass unto the other heirs *per stirpes,* when the widow did decease. The death of the widow is the contingency which gives life to the devise, the executory devise and interest.

The general rules of construction applied in the foregoing are

"Where a testator uses in his will technical words or terms, or words having a definite legal signification, he will be presumed to have used them in that sense, and it will be so construed, unless a clear intention to the contrary is apparent from the context.    40 Cyc., 1398.

"The relation and effect of succeeding clauses in a will depends upon the intention of the testator as gathered from the whole will, and the local order of the will may be disregarded and its clauses and provisions transposed, if thereby every part can be rendered consistent and effective.    40 Cyc., 1413.

"Isolated statements or separate clauses and provisions should not be considered alone," etc. *Id.*

"The relative position of the clauses or provisions may be disregarded."    *Id.*

The provision as to survivorship fixes the time thereof as at the death of any child before receiving his or her share.

In *Renner* v. *Williams,* 71 O. S., 340, 357, it is said:

"It seems conclusively to follow that when a testator provides merely that in case of death of one or more of the devisees or legatees, the survivor or survivors shall take the provision made in the will, he refers to the survivorship which shall exist at the time a devise of real estate may vest or when a legacy may be payable."

Or it refers to the termination of a particular interest, such as at the time of the death of a devisee of legatee. See 40 Cyc., 1512.

The devise or legacy to David or Robert, was contingent upon their living until it became vested by the death of the widow.

A devise to two children of a testator, with provision that "should either die without heirs capable of inheriting, all such one's share and legacies under this will shall inure to the survivor," vests in each an estate in fee determinable upon the contingency of death without children; and, upon that contingency the estate of the deceased child passes to the other by way of executory devise. *Durfee* v. *MacNeil*, 58 O. S., 238.

But the provision in the Westwater will is not a devise of the fee. It is a devise of the proceeds of the sale of real estate, after the termination of a life estate, and, as claimed by counsel for defendants, it can be nothing more than an executory devise, or interest.

6. THE DEVISE AND BEQUEST IS AN "EXECUTORY DEVISE OR INTEREST" CLEARLY DISTINGUISHED FROM A "POSSIBILITY COUPLED WITH AN INTEREST" AND "CONTINGENT REMAINDER."

An executory devise strictly is such a limitation of a future estate or interest in lands, or personalty, as the law admits in the case of a will, though contrary to the rules of limitations in conveyances at common law. *Thompson* v. *Hoop*, 6 O. S., 481, 486.

Executory interests, however created, are such as take effect at some time in the future, measuring from the time when the document takes effect. An executory devise is a devise of an estate or interest which shall not vest at the time of the death of the devisor, i. e., when the will becomes operative. *McArthur* v. *Scott*, 113 U. S., 359.

An executory devise is one to persons whose existence is uncertain, as by a limitation of an interest over by survivorship, as a limitation over to persons who survive a certain event when the same is to vest. 40 Cyc., 1646; *Lapham* v. *Martin*, 33 O. S., 99; *Rutledge* v. *Fishburne*, 66 S. C., 155, 97 Am. St., 756. In *Lapham* v. *Martin, supra,* the bequest was to M. L., provided if she died leaving no child of her own, the money shall be equally divided between the testator's children; it was held to be an *executory devise, because the limitation over was dependent on a future uncertain event, her dying leaving no child.*

"An executory devise is a limitation by will of future contingent interest in lands, contrary to the rules of limitation of contingent estates in conveyances at law." 4 Kent Com., 264.

"There were two kinds of executory devises relative to real estate, and a third sort relative to personal estate. (1) Where the devisor parts with his whole estate, but, *upon some contingency* qualifies the disposition of it, and limits an estate on that contingency. * * * (2) Where the testator gives a future interest to arise upon a contingency, but does not part with the fee in the meantime. * * * (3) At common law, * * * if there was an executory bequest of personal property, as of a term for years to A for life, and after his death B the ulterior limitation was void, and the whole property vested in A." 4 Kent, 268-9.

"If the 'limitation' of an estate or interest be over to take effect on failure of issue *living at the time of the death* of the person named as the first taker, then the contingency determines at his death, and no rule of (common) law is broken, and the executory devise is sustained." *Id.,* p. 274.

The limitation in the Westwater will is that in the event that any of his children die before the receipt of his or her share, leaving no issue of his or her body, the share of such ones who may die before the death of the widow, the time fixed by the will for distribution, then the share of the one so dying without issue shall go to the brothers and sisters surviving their heirs or assigns *per stirpes*.

Two contingencies are presented by the will, viz.: one, that of dying without issue before the widow and before distribution, and (2) another, that of death before distribution, but leaving

issue. That is, in case of death of a beneficiary *without* issue, and of death of another beneficiary leaving isssue, before death of the widow, and before the time fixed for distribution, in either event the share of each and both of such beneficiaries passes and becomes vested upon death of the widow, *per stirpes* to the children of the testator surviving and their heirs. This means that the share of Robert will vest in his children and the share of David will vest in the surviving children of the testator, and *per stirpes* in the children of Robert.

It has been stated that no question can arise in the course of legal inquiry, less referable to fixed and certain rules and principles than whether the words of a devise or bequest constitute a vested or contingent interest. Such conception, however, is due to the ever-varying language of testamentary instruments as affecting intention. The leading inquiry upon which the question whether a devise be vested or contingent, is whether the gift is immediate, and the time of payment or of enjoyment only postponed, or is *future and contingent,* depending upon surviving some other person, and death *with* or *without* issue, and the number of issue left.

The names of all the beneficiaries who may take under the Westwater will were not fixed and determinable by the testator at the execution of his will, nor were they ascertainable at any time according to the natural course of events until after the death of the widow.

The settled rule applicable to such provision as is contained in the will under consideration is, that where the futurity is annexed to the substance of the devise or bequest, the vesting is suspended; it is only when the gift is absolute, and the time of payment only is postponed, that the same may vest upon death of the testator.

When the time and condition upon which the devise is made, is annexed to the substance of the gift by way of conditional precedent, and the vesting or not in certain persons is made dependent upon events or conditions which may never happen or arise (as in Westwater will), the same is then subject to a condition precedent, and is contingent. This is the settled doctrine.

See Monographic note (and cases) 10 Am. St. Rep., 470-479; *Everitt* v. *Id.*, 29 N. Y., 39; *Scofield* v. *Olcott*, 120 Ill., 362; *Colt* v. *Hubbard*, 33 Conn., 281; *McClure's Appeal*, 72 Pa. St., 414; *Scott* v. *West*, 63 Wis., 529.

It is entirely clear that none of the Westwater beneficiaries had a vested interest but that the devise was contingent on events that, by the *law of the will*, would pass the vested interest to others not named, and who were to share equally (*per stirpes*) with those surviving; while those surviving would have additional shares added to their own.

These features unmistakably show that the devise and bequests are not pure legacies; because they are not fixed and definite; that they are not remainders because not an estate in the land itself, but are by way of executory devise.

An executory devise is clearly distinguished from both a contingent remainder and what is frequently classed as a "possibility coupled with an interest." In a contingent remainder the fee becomes vested on the death of a testator. In the case of a "possibility coupled with an interest," the beneficiaries each and all of them are capable of *definite ascertainment* and of being fixed by the testator at the time of making his devise. Hence in each of such cases, the essential interests of each of such beneficiaries being fixed and definite, but contingent upon a certain event or happening, it is therefore possible for any or all of them to make agreements of release between themselves which may be binding and enforcible in equity. They have a fixed and definite interest, which may on their death pass to other beneficiaries whose status under the devise is equally fixed and definite. There is then no possibility of other and new beneficial interests intervening to share the devise upon death of one of them. If the Westwater will had provided that on the death of one beneficiary his share should go to the survivor or survivors, and not to their heirs, not *per stirpes*, then the testator would by his will have fixed and determined the beneficiaries without uncertainty. In such case the interest of each, before the death of the widow, would have been classed as a "possibility coupled with an interest," the interest not then being contingent except

upon the certainty of death, according to which all reckonings are made.

To summarize, then, it may be stated that: a contingent executory devise, or bequest, when the persons who are to take upon the happening of the contingency are definitely ascertained and fixed by the testator, is then to be classed as a possibility coupled with an interest. That is, the interest of the class of persons who are to take on the happening of the contingency is definitely fixed by the testator. That interest coupled with the possibility is such that it may be transferred and assigned or released in equity, at least between the beneficiaries themselves.

But where each and all the persons who, under all possible contingencies may not be ascertained, fixed and determined by the testator himself at the time of making his testamentary disposition, being made dependent upon death and birth, then such possibility is not to be classed with those which are considered as being coupled with an interest, and capable of full release and extinguishment as between themselves in equity.

It must be that class of executory devises, or possibilities coupled with an interest, where each and all of the interests of the beneficiaries are capable of being definitely ascertained and fixed by the testator, and which are so fixed by him, by devise, that may fully release quitclaim or devise, to each other.

Executory devises were instituted in order to support and effectuate the intention of a testator concerning limitations in future estates, which could not take effect as a remainder or other kind of testamentary interest, consistently with law. A preceding estate or interest is not essential or material. *Lessee v. Hoop,* 6 O. S., 481, 485-6; 28 Am. St., 660.

Its essential rule is that an executory devise can not be created if the first estate is such that it can be alienated; and *such devise is indestructible by any act* of the owner of the preceding estate (*Williams* v. *Elliott,* 246 Ill., 548; 136 Am. St., 254, 256). There can be no executory devise if the estate devised to the first devisee is such that he can, by virtue of his ownership, alienate the estate in fee simple. *Id.,* 4 Kent Com., 10; *Smith* v. *Kimball,* 153 Ill., 1029.

While this rule has reference to the interest of the widow and to the beneficial use to the daughters, in the Westwater will, still the principle is suggestive as touching the statutes of the preceding contingent interest of the children of the testator. There is an executory devise over to his grandchildren, if one of his heirs died before the widow. To permit any one or all of his children to alienate, assign or release their contingent interests to each other would be destructible of the executory devise to his grandchildren.

Indeed the interest of the children of the testator is precisely analogous to that of heirs by descent, but without even as much certainty; it is a mere naked possibility.

"Executory devises are applicable to testamentary dispositions of personal property, although in such cases the limitation is more properly termed as executory bequest; and under the common law rule against creation of remainders in personal property, any limitation over of a future interest therein would necessarily operate only as an executory devise. An executory devise or bequest of personal property may be created by limitation over upon the first devisee dying without issue." 40 Cyc., 1648; *Glover* v. *Condell*, 163 Ill., 566; 33 L. R. A., 360.

An estate is contingent while the person or persons to whom or the event upon which it is limited to take effect is uncertain. 40 Cyc., 1649; *Wadsworth* v. *Murray*, 29 N. Y. App. Div., 191; 161 N. Y., 274; 76 Am. St., 265.

"If the time or event is annexed to the payment of the legacy, it is vested; if *to the substance* or gift of the legacy, it is contingent. One of the tests, although not exclusive, is the right of alienation. If the beneficiary is clothed with a present right of alienation, the estate is vested; otherwise not." 40 Cyc., 1650.

Where the direction of the will is to pay or distribute in the future, the beneficial interests do not vest until the time for distribution, when the reasons for such postponement are personal to any of the beneficiaries. Such a devise or bequest is clearly contingent when it is deferred according to the general plan of the.trust or beneficial use of the devise and bequest is specially made for the direct and personal benefit of certain or all bene-

ficiaries, as is the case under the Westwater will. See 40 Cyc., 1656-57 and cases. See *Engles Estate,* 166 Pa. St., 280, where there was similar provision to the Westwater will.

It seems clearly to be demonstrated that the provision to the beneficiaries under the will of deceased Westwater was by executory devise and bequest. When this point is decided it must follow that the interests were contingent and not vested; this must follow because no legal sale, assignment or alienation can be made by the beneficiaries, because for them to have such power would be to destroy the devise. This statement has no reference to the enforcement of an equitable contract of estoppel against those who survive the death of the widow. See *Gales* v. *Seibert,* 80 Am. St. Rep., 265, on p. 629; 157 Mo., 254.

### 7. MAY AN EXECUTORY DEVISE OR INTEREST BE ASSIGNED OR RELEASED.

Having determined that the beneficiaries under the Westwater will take a contingent executory devise and interest the question next to be considered and decided is whether such beneficiaries may in equity assign or release their beneficial interest, contingent upon their survival of the widow, to each other before the happening of the contingency which operates to vest the interest in them. It is to be conceded that they may not make legal conveyance of the real estate or of the personalty.

The clear distinction between contingent remainders, executory devise, interests and possibilities coupled with an interest, must be kept in mind in order to properly apply the rules, as well as to distinguish the cases and the doctrine which they enunciate.

Where a will creates a contingent remainder, by fiction of law the fee becomes vested in the remainderman subject to the limitations of the devise. But in case of an executory devise or interest no fee becomes vested in the beneficiary on the death of the testator.

The common law, it is said, did not sanction or recognize the right to grant or assign a possibility or a right of title. Con-

tingent remainders and executory interests were not assignable. But later by the English Statute of Wills they could be devised, and by common law they could be released by an instrument operating by way of estoppel. Contracts and assurances relating to them for a valuable consideration may generally be enforced in equity. Such is the *dictum* contained in *Bartholomew* v. *Muzzy,* 61 Conn., 206; 29 Am. St., 206 (citing *Chellis on Real Property,* 52; *Smith* v. *Pendell,* 19 Conn., 112; 48 Am. Dec., 146). The conveyance involved, however, had to do with a contingent remainder, not an executory devise.

The statement is frequently made that in this country all contingent and executory interests, such as contingent remainders and executory devises to persons who are certain, and other possibilities coupled with an interest, are assignable, at least in equity.

See *Monographic Note,* 56 Am. St., 339-361 on pp. 360-1, citing *Nimmo* v. *Davis,* 7 Tex., 26; *Fortesque* v. *Satterwaite,* 1 Ired, 560; *Bodenhamer* v. *Welch,* 89 N. C., 78; *Miller* v. *Emans,* 19 N. Y., 384; *Watson* v. *Smith,* 110 N. C., 6; 28 Am. St., 665; *Brown* v. *Dail,* 117 N. C., 41; *Wheelen* v. *Phillips,* 151 Pa. St., 312; *Smith* v. *Pendell,* 19 Conn., 107; 48 Am. Dec., 146, and other cases. See *Pomeroy's Eq. Jur.,* Section 1287, *et seq.*

The above statement found in the discussions of judicial opinion on the general subject of contingent interests is misleading, because it includes therein executory devises and interests as if the same rule applied to contingent remainders, possibilities coupled with an interest, and executory devises. Careful examination of the cases bearing on these questions clearly show the points of distinction between the rules and decisions applicable to contingent remainders, executory devises or interests, and possibilities coupled with an interest.

From an early period the rule applicable to *contingent remainders* has been that as expressed in *Jeffers* v. *Lampson,* 10 O. S., 102, 108, viz:

"The law has always allowed *releases* of rights by way of contingent remainder as between the terre-tenants, those who take the same rights, as remainder in fee."

. The rule of English law found in the early case of *Arthur* v. *Rokenham*, 11 Mod., 152, as applicable to a "possible right" only, was thus stated:

"Yet the law has allowed releases of rights, which are in the nature only of possibilities, that a man may release to him who has the *possession of a possible right only*, though it does not allow him to transfer or convey away to a *stranger* such a right; and that is why the law allows a man to release an *executory interest* in a term which he has devised to him, and is in the nature of a possibility; but yet he can not assign it away to a third person, though he may, as I said before, release this right to the possessor of the land by way of extinguishment."

An executory devise was not involved in that case.

The court in *Jeffers* v. *Lampson*, while conceding that William Jeffers at the time he released to Henry had merely a *contingent remainder*, and though not a terre-tenant, or the *actual possessor* of the land, still the release by William to Henry though not within the ancient rule as stated, was nevertheless clearly within the reason thereof.

In each of the two brothers, Henry and William, the court held *"there was a present interest, a vested remainder"*; that Henry who purchased of William *"had a large and valuable vested interest in it, and the release operated by way of 'relinquishment' and tended to 'repose and quiet.' "* It was held that though Henry, to whom William had quit-claimed his contingent interest in the fee, did not survive the widow—the life tenant—while William did nevertheless William could not be permitted to assert his claim to the fee under the will against the assigns of Henry, because he had quit-claimed his contingent fee to him, and it was entirely competent for him to do so in law.

The grounds of this decision seem to be: first, that the fee was vested in the devisees; and secondly, that such release of a vested interest may be made between persons having the same vested fee. It is to be noted that the court declined to give approval to the application of such rule to conveyances to a *stranger* as had been done in the cases of *Pelletrean* v. *Jackson*, 11 Wend., 110; *Jackson* v. *Varick*, 13 Wend., 178. These two deci-

sions were subsequently overruled in *Miller* v. *Emmans,* 19 N. Y., 384 (1859), where the same doctrine of *Jeffers* v. *Lampson* was applied, it being held that the future contingent interest of the devisees was not a mere naked possibility, but passed by release from some of them to the others. The court stated:

"It seems that any and every contingent right, however uncertain, may be released to a part already seized of a *present estate* in the premises in possession, and that the mere remoteness of the contingency affords no objection to its being so released, provided the right can be said to have any present existence." The four heirs had a vested fee subject to be lost on the death of any of them.

A monographic note in 56 Am. St. Rep., 339-361, is the most complete discussion found, and it cites many authorities which appear to apply to the question under consideration. It contains by far the best discussion and furnishes the most complete collection of decisions that has been found bearing on the topic of "Contingent Interests." The cases cited have all been examined, and some reference and comment is made respecting them. The following is quoted from the Notes:

"Courts of equity are in the habit of giving effect to assignments of contingent interests and expectancies, whether they are in real or personal property, 'not, indeed, as a present positive transfer, operative *in presenti,* for that can only be done of a thing *in esse, but as a present* contract, to take effect and attach as soon as the thing comes *in esse.*' " *Bibend* v. *Ins. Co.,* 30 Cal., 79, 86; *Union Mfg. Co.* v. *Loundsbury,* 41 N. Y., 363, 374; *Field* v. *Mayor,* 6 N. Y., 179; 57 Am. Dec., 435 (assignment of all bills that might become due for job printing); *Collins Appeal,* 107 Pa. St., 590; 52 Am. Rep., 479 (assignment, pledging all interest in limited partnership); *East Lewisburg, etc., Mfg. Co.* v. *Marsh,* 91 Pa. St., 96; *Ridgeway* v. *Underwood,* 67 Ill., 419; *Crum* v. *Sawyer,* 132 Ill., 443 (contract by husband to release his contingent interest in his wife's lands).

The parenthetical explanations of the cases cited show the want of application to the present will. *Bolton* v. *Bank,* 50 O. S., 290, is urged by plaintiff as an authority. There was a devise of real estate in trust to collect rents and pay a definite sum

annually to the widow during life, and to divide the residue equally among the children or their heirs; and at the death of the widow to convey an equal part of the lands to each of his children or their heirs. This was held to vest an equitable estate in each one of the children. The *per curiam* of the court, without comment or reasoning, considered this as vesting an equitable estate at the death of the testator. The case is not applicable because it deals exclusively with the fee.

The case of *Jeffers* v. *Lampson*, 10 O. S., 102, is not in point because it has to do with a vested remainder subject to be defeated. As stated by the court:

"Here, then, was a vested remainder in William and Henry in those premises, in equal and undivided moieties in common, subject, however, to be divested on the happening of a contingency. *In each there was a present interest,* a vested remainder; and in each there was a possibility of a survivorship to the whole premises, depending on a contingency which did afterwards actually happen."

A careful examination of the decisions on the subject of *contingent interests* discloses that they have universally dealt with contingent remainders, or with possibilities coupled with an interest. In the general discussion of the rule the opinions and texts are usually couched in language which apparently embrace and apply to "executory devises or interests," possibilities coupled with an interest, and contingent remainders, as if one general formula applied to each. In the valuable Monographic Note, 56 Am. St., 339, there seems to be not more than two decisions bearing directly on executory devises or interest.

In *Nimms* v. *Davis,* 7 Texas, 26 (1851), there was a disposition of negroes. It was stated that:

"All contingent and executory interests are assignable in equity, and will be enforced if made for a valuable consideration.  *  *  *  All executory uses and possibilities, coupled with an interest, where the person to take is certain, are transmissible by descent, and divisible and assignable. It is incumbent on the party dealing with the heirs to show that the dealing is fair and for an adequate consideration."

This is a correct statement of law, but not applicable to the executory interest in the will under consideration.

In *Wheelen* v. *Phillips,* 151 Pa. St., 312, a legatee was entitled to a legacy of $4,666.66, contingent upon his surviving his mother. During the lifetime of his mother, who was then 76 years of age, the legatee being in financial straits, sold his interest in the legacy for $1,000 to a person who stood in no trust relation to him. If he died before his mother, then nothing would pass to the assignee.

Charles L. Phillips, the legatee, made assignment of the legacy to Jno. M. Doyle, who assigned it to W. E. Dobbins. Subsequently Phillips became vested with the devise, by surviving his mother, and entitled to the legacy of $4,666.66 and also to a distributive share of a legacy to his sister contingent upon her surviving her mother, which she did not do.

The clause in the will was:

To her sons, Henry, Edwin and Charles L. and the issue of any of them that may be deceased, then (at death of Mrs. Phillips) living, each the sum of $4,666.66, such issue of deceased daughters or sons taking, however, only the sum that would have been payable to their parents living.

If Charles L. had died before his mother, his share would have gone to his heirs. But having survived his mother the legacy became vested in him. He had sold it to a stranger whose right to hold it in equity was upheld.

This decision is the only one found which appears to involve an executory interest. The will contained a gift of a legacy, which was contingent on survivorship. The facts in the case disclose that the beneficiary took a beneficial interest of another legatee, his sister, by reason of her death, and under the clause of survivorship. He lost both on account of his assignment, and because he survived the contingency by reason whereof the legacy became vested. But having made a sale and transfer, he was held bound to it in equity, in the absence of inequitable considerations.

The conclusion after careful reading and consideration of the decisions directly or indirectly bearing on the question must be,

that the assignability of an executory devise or interest, such as is involved in this case, is not to be governed by the same rule that is applicable to a contingent remainder or to a possibility coupled with an interest. The point of distinction is well illustrated by the decision in *Jeffers* v. *Lampson, supra.* In that case the quit-claim by one contingent remainderman to another was upheld as against the one who had transferred it to his brother, although the latter, who had transferred the whole of the contingent remainder to a stranger, did not survive the life estate, while the assignor did survive the life tenant. By the terms of the will the final estate would have become vested in the assignor, and not in the assignee. But because the assignee was possessed of the fee, it was considered that as he had a large and valuable vested interest in the fee, it tended to "repose and quiet" to the persons who took the estate from the transferee with covenants of warranty, for a valuable consideration, and other subsequent grantees on the faith of the original release, who had also acquired the interest of the life estate by proper conveyance.

But in an executory devise or interest such as that released by Robert Westwater there was no vested interest which he could convey or release. As Robert did not survive the holder of the life interest, or Rosean Westwater, the surviving brothers and sisters have acquired vested interests in the devise, but they can not assert an equitable right against the legal representatives of Robert. Robert had no vested interest at the time of his quit-claim and assignment, analogous to that of a vested fee of a contingent remainder, which he could release to other beneficiaries.

The soundness of this conclusion may well be illustrated by the position of James, who survived the widow, and whose interest vested subject to any equities that may be asserted against him. No estate in fee simple became vested in James, John or the two sisters, because no such devise is made in the will. The quit-claim deeds executed by each of them are not effective as deeds of conveyance, because none of them became vested with a fee. But such instruments, if fairly entered into, without constructive fraud, and for adequate consideration, may be asserted

by each against the other *in equity or by way of estoppel*, for the purpose of adjusting the equitable interests which each of them may have in the estate. This rule may be applied as between the surviving children of the testator, but not to the heirs of any not surviving.

The quit-claim deeds can not operate as such, because by the will no estate in the land itself was devised. The will directed the land to be sold, and the proceeds thereof, together with the proceeds from sale of the store or business, as well as the accumulated profits arising therefrom, and the investments by the executor, be distributed equally between all the beneficiaries *per stirpes*.

It is impossible to convey a clear title to the Westwater land by reason of the provisions of the will, the condition of the estate, and because of the death of Robert before the death of his mother, except by a sale of the real estate as directed by the will. The land must thus be sold and conveyed to confer a good title, or else all the living beneficiaries—including the heirs of Robert —must make a deed for the same, relinquishing all their right, title or interest under the will and the law.

A purchaser can not obtain a clear title in any other way. It would then have to be made to appear that all the conditions of the will had been carried out to the satisfaction of all beneficiaries.

It must, therefore, be concluded that the deeds of quit-claim are invalid as legal conveyances; and that the assignment and release by Robert is void; that the interests of Robert and David have become vested in the survivors and the legal representatives of Robert.

The law of a will is as mandatory as statutes of descent. It can not be departed from except as the parties may legally make an agreement among themselves, which will bind them in equity. But only the beneficiaries can bind themselves, according to the interest they have. Robert received from the executor the sum of $19,955.60, which did not belong to him by the terms of the will, and which the executor had no right to pay to him. If Robert were living, a court of equity might consider his conduct and agreements, together with that of the other beneficiaries, and

hold him and them to the consequences thereof. This may be done as between those living, but not as to heirs of those deceased. The facts of the adjudicated cases have been examined to ascertain whether any of them dealt with conditions such as we have here. But the reported cases have not been between the dead and the living where the children of the dead are to take *per stirpes*.

It would seem from the conduct of the executor, his accounts and his administration, that he did not regard the rights of all who may become beneficiaries. He had no power or right to make "advancements;" he could not have understood the will when he made the advancements. He wrongfully paid out much money of the estate to different beneficiaries before he thought of getting protection for himself or for the beneficiaries. He had not counted on the effects of death. He thought he could will his own interest. The agreement of March 30, 1900, was executed to bind each of the beneficiaries to all of such payments. Previous to that date no general agreement had been made, binding each and all to such plan of division. It is specially significant that the agreement recites that these "advancements" were made by the personal and individual solicitation, and not because the executor desired to do so, or for any benefit of his own, and still he had taken out of the funds an "advancement" for himself of that sum, $20,064.42. Special mention was made of the fact that each and all were fully aware of the provisions of the will relative to the distribution and settlement of the estate between themselves after the mother's death. No doubt it was perceived that there was danger in the plan of division without authority.

If Robert and David were now living, each and all the beneficiaries could in equity be held to their agreement, just as William Jeffers was in *Jeffers* v. *Lampson, supra,* and just as Charles L. Phillips was to his release of a legacy in *Wheelen* v. *Phillips, supra.* But their interest on the death of the widow became vested in James, John, the two sisters, and the heirs of Robert.

The fact that the will provides that the share of the one or ones who died before their mother shall go to the brothers and sisters surviving and heirs *per stirpes,* is a clear demonstration

that the shares devised to Robert and David did not vest until after their death, nor until the death of the widow, because the will is so framed that it provides for a distribution in such event to persons who stand in unequal degrees, between persons who claim by representation. Because of that fact the testator directs that the distribution shall be made *per stirpes*. If the testator had not intended the children of any deceased child to be beneficiaries he would not have specially directed distribution to children and heirs *per stirpes*.

This is unmistakable proof that the executory interests never became vested in either Robert or David, and that the interest of David as well as that of Robert is to be distributed to James, John, Mrs. Guitner, Mrs. Hughes, and to the children of Robert, *per stirpes*.

Robert received $19,955.60 and David received $20,064.42, a total of $40,020.02, which should have been distributed *per stirpes* between the survivors and their legal representatives. One-fifth of this sum became vested in the children of Robert, while one-fifth thereof became vested in each of the surviving children, James, John, Mrs. Guitner and Mrs. Hughes.

I have been unable to perceive any equitable ground or basis for concluding that the children are in any wise bound by the acts of their father, who had no vested interest, and have no legal right to any of the money paid to him by the executor.

According to the will the whole $126,787.64 which was distributed to the children of the testator should have been invested and held for distribution until the time fixed by the will. The children of Robert Westwater are entitled to one-fifth of all that has been advanced.

It is to be observed finally that while the judiciary may in equity hold the immediate parties, when living, to their contracts and agreements when fairly made, after their contingent interest has become fully vested, still it can not substitute its will and the agreement of deceased and living beneficiaries, for the solemn devise of the testator which operates and becomes effective upon conditions provided therein.

The executor held the moneys of the estate as a trust to be vested on the happening of certain conditions, not to be distrib-

uted by him in contravention of the will, or upon agreement between persons having no vested interest.

9.   THE WILL OF DAVID WESTWATER TO JOHN AND SISTERS.

David Westwater died before his mother, and before the time of distribution fixed by the will.  He made a will by which he undertook to devise and bequeath the share devised to him in his father's will to his brother John and his two sisters.  The will of David can have no legal or equitable force and effect.  An executory devise is by nature contingent, and subject to the limitations contained in the will.  David did not have any interest that he could devise.

Nothing need be further stated concerning this matter, except by way of explanation of certain statements found concerning the alleged right to devise an interest given by way of executory devise.

The following statement is made in the Note to 56 Am. St., 360, viz:

"All contingent estates of inheritance, as well as springing and executory uses and possibilities coupled with an interest, where the person to take is certain, are transmissible by descent and *devisable* and assignable."

*Nimmo* v. *Davis*, 7 Texas, 26 (1851), is cited.  There was no question of the validity of an executory devise such as is involved in the Westwater will, so the statement has no application.

Kent in his *Commentaries* (Vol. 4, p. 285), states:

"These executory interests, whether real or personal estates, like contingent remainders, may be assigned or devised, and they are transmissible to the representatives of the devisee, if he die before the contingency happens; and they vest in the representatives, either of the real or personal estate, as the case may be, when the contingency does happen."

The statement is not entirely accurate, and does not apply to the case at bar.

The learned chancellor, however, at another place in his treatise, Vol. 4, p. 261, states:

"All contingent and executory interests *are assignable in equity,* and will be enforced if made for a valuable consideration; and it is settled, that all contingent estates of inheritance, as well as springing uses and possibilities, coupled with an interest, *where the person to take is certain,* are transmissible by *descent,* and are *devisable* and assignable. *If the persons be not ascertained they are not then possibilities coupled with an interest, and they can not be devised* or descend, at common law."

There is no possibility coupled with an interest involved in this case. And executory devise such as David had under his father's will, could not be devised by him, because it was contingent and never became vested in him. The learned chancellor and author could not have had in mind such an executory devise when the above was written. It is not a correct statement as applicable to this case. The learned author stated in a note:

"But where there is a devise of White acre to A, and of Black acre to B, and if either of them die without issue, his estate to go to the survivor, and both be living, such a possibility can not be assigned, or released, or devised, or pass by descent, and can only be extinguished by estoppel." *Jackson* v. *Waldron,* 13 Wend, 178; 4 Kent Com., 262, Note.

This is the case and doctrine which Wood, J., in *Jeffers* v. *Lampson,* 10 O. S., refused to follow. wherein the court sustained a relinquishment between the beneficiaries themselves.

It is to be observed that Chancellor Kent and the authority cited by him, was considering contingent and executory interests without distinguishing between such devises by contingent remainder in fee, and executory devises.

All the beneficiaries by name and interest were not fixed and definite and certain by the will·of Westwater; only part of them were fixed and definite at the time of the execution of the will, and these were liable to be changed, as afterwards they were, by death. Hence it follows that under the will here involved there was neither a contingent remainder, not a possibility coupled with an interest as that term is defined. It follows that David had not vested interest, or possibility coupled with an

interest which he could by a will devise to his brother John or his sisters.

Under the topic: "The Devise and Bequest is an Executory Devise or Interest Clearly Distinguished for a Possibility Coupled with an Interest and Contingent Remainder" it is clearly made to appear that the rule applicable to a release of an "executory devise and bequest," or of a "Possibility Coupled with an Interest" is radically different; that an executory interest such as is contained in the will in this case can not be devised, and that a possibility such as David had under his father's will, was not one coupled with an interest because the beneficiaries were not definitely ascertained and fixed by the will, and that therefore the contingent interest which David took under his father's will could not be devised to any one or more of the beneficiaries named in such will.

The interest which a contingent devisee takes is not a vested one like the fee in the case of a contingent remainder. The latter is vested subject to be divested, while the contingent executory devise does not vest at all until the event occurs which passes the devise.

One who takes the vested fee of a remainder takes it subject to the contingency that it may be divested upon a subsequent event, but with knowledge that if the contingency finally vests the estate in the grantee, it becomes an indefeasable estate.

That is, if William Jeffers, as in *Jeffers* v. *Lampson, supra,* had assigned his contingent fee to Lampson instead of to his brother Henry, and William had died, the estate would have become vested in Henry Jeffers, and Lampson would have been divested of the estate.

So it thus appears that a transfer of a contingent remainder will not become vested unless the devisee survives the contingent event.

In *Jeffers* v. *Lampson, supra,* though William conveyed to Henry, the latter not surviving, the contingent remainder in fact became vested in William. Lampson purchased the contingent interest of Henry, but as William, who had released his interest for a valuable consideration, survived, his conveyance became operative in favor of the assigns of his brother Henry.

So it is thus seen that even the assignment of a contingent remainder, though supported by a present estate, may be defeated by death of the grantor thereof before the happening of the contingency which divests such grantor thereof, and invests it in another devisee who survives the contingency.

Thus we see how a grant or release of both a contingent remainder and an executory devise may alike be defeated, so that any one who may take an assignment thereof subject to the contingencies must assume the risk.

An assignment or release of either a contingent remainder or an executory devise will take effect in equity when the subject to which it refers has "ceased to rest in possibility," and has "ripened into reality" (*Pierce* v. *Robinson*, 13 Cal., 116, 124; *Ridgeway* v. *Underwood*, 67 Ill., 419); or when the assignor is in a condition to give it effect (*Bailey* v. *Happin*, 12 R. I., 568). A sale, assignment or release can only be enforced in equity, after the death of the life tenant, or of the happening of the contingent event, and after the expectancy has fallen into possession. And this may be done as a right of contract. *Ridgeway* v. *Underwood*, 67 Ill., 419; *Crum* v. *Sawyer*, 132 Ill., 443; *Brown* v. *Brown*, 66 Conn., 493, 498; *McDonald* v. *McDonald*, 5 Jones Eq., 211; 75 Am. St., 434.

Executory devises were made possible only by the Statute of Wills. But there is no rule in common law, and no rule of American decision that can give life or legal effect to a devise by a beneficiary of an executory devise contingent on his own survival of a precedent life interest. Hence it must be concluded that the will of David Westwater is ineffective in law or equity and that the contingent interest devised to him became, on his death, and the death of his mother, vested in the beneficiaries surviving the widow and their heirs, *per stirpes*.

10. FACTS AND CIRCUMSTANCES CONCERNING AGREEMENTS EVIDENCED BY QUIT-CLAIM DEEDS AND ASSIGNMENTS OR RELEASES BY ROBERT WESTWATER AND JAMES WESTWATER.

The quit-claim deeds by Robert and wife, and by James to their brothers and sisters, and by the latter to James, may not

be regarded as legal conveyances, because none of them at the time of their execution had any legal estate or interest in lands that could be conveyed by either to the other. They can only operate to estop those who have survived the widow from denying the binding character of it in equity; or it may be considered as a contract in equity binding him to actually release his interest when it becomes vested in him.

Neither can the paper writing signed by Robert to James and the other brothers and sisters, and by James to David, John and the sisters purporting to be an assignment of the interest of Robert and James, be considered legal transfers of their interests, because they were not possessed of a legal interest. They constitute mere equitable contracts on their part to make such releases when the interests become vested in them.

The agreement made March 19, 1900, by all the parties, ratifying past alleged advancements, is not to be viewed as an authorized legal document, nor as a legal transfer, but like the other paper writings it is to be looked upon as but one of the chains in the circumstances and transactions to be considered in adjusting the equities between the parties. Having no vested interest at the time, nothing but a mere contingent one, by law one beneficiary may only be held in equity to relinquish the executory interest to another beneficiary, provided the agreement made is fair and reasonable and provided the same was entered into in good faith, and provided the same is free from inequitable conduct or fraud, actual or constructive. Only under such conditions may such releases be sustained in equity. And when the interest vests, such beneficiary may be compelled in equity to perform his contract to relinquish his interest when the same becomes vested in him, if the foregoing requirements be complied with.

James Westwater claims that David Westwater, acting for himself and his brother John and sisters, falsely represented to him that the sum of $25,299.80 and the property conveyed to him constituted his full share of the estate; that he (James) was ignorant of the value of the estate, especially of the value of the business, and the amount invested therein; that he relied upon such representations.

The burden of the complaint made by the legal representatives of Robert and James Westwater is that neither Robert nor James had adequate knowledge of the extent and value of the estate.

The business of the estate had been carried on from February 26th, 1894, the death of the testator, to the dates of the releases made by Robert and James (July 7, 1900, by Robert) and August 20, 1902. There had at that time been accumulations of profits from the business. These had been invested by way of improvements in the North Kerr Graveyard property, while some of it has been invested in bank stock. These transactions were all shown on separate books which David kept as executor, and were kept at the store. It does not appear that opportunity was offered James to examine the books or to obtain any information therefrom concerning the condition of the business or of the estate.

The investments by way of improvements of the graveyard property and in bank stock—the latter in David's individual name—was contrary to the specific directions of the will. By reason of the improvement of that real estate its income was greatly increased, and by reason thereof special agreement was made by the executor with the two "daughters" to whom the income was given, by which it was agreed by the executor and the "daughters" that the latter should be paid but the sum of $100 per month each, the remaining rentals going into the estate account.

The dividends from the stock were paid to the account of the estate.

The executor failed to make the invoice as required by the will, so that other beneficiaries had no opportunity of knowing the value of the stock in the beginning. But one invoice was made of the store during the continuance of the business, which was some years after the death of the testator.

The circumstances under which David went to California disclose that Robert had been importuning him for money, and that he was determined upon ending this. The fact that Robert was hard pressed, and the testimony of Mrs. Robert Westwater tends to show that some pressure was used in getting her signature.

It is established that David did not communicate to James the fact that Robert had relinquished his interest to James, David and the rest. The manner of the negotiations between David and James, through the son of the latter, if we have all that took place and that was communicated, was on its face not reasonable and fair. An examination of the executor's accounts filed in court would not sufficiently advise either Robert or James of the condition of the estate, and especially of the profits from the business, and of the accumulations of the profits therefrom and their investments.

A contract was made with the executor with the employees of the store by which a profit-sharing partnership was entered into, paying to the estate an arbitrary rate of interest on a valuation of the store at $100,000. This was not within the powers of the executor. Whether it was advantageous or not does not matter, because it was not authorized. It was not made known to James and Robert so far as the evidence discloses.

The evidence discloses that on inquiry James was told by the executor that it was none of his business how the store was doing.

The will required that: "careful books of account of said business shall be kept and an invoice of stock shall be taken during the first year after my decease, which invoice and accounting of stock shall be put in writing and preserved."

No invoice was made. If careful books were kept, they were not inspected by James and Robert, and even John, who was connected with the business, had little knowledge of them; as he left everything to David. It is apparent that David pursued a course of management of the business and of the estate according to his own notions, and did not give heed or regard to the obligations of the will. He did not make use of the surplus from the business as required by the will.

Careful examination has been made of the official accounts filed by the executor in the probate court, with a view to ascertaining whether the heirs, especially James, who lived here, could gain any definite knowledge as to the condition of the estate.

The first account filed, March 22, 1895, gives receipts and expenditures in the business of the store. It shows bank deposits and store disbursements. It shows the payments to the daugh-

ters of what probably is rent. It shows one payment to "R. Westwater" of $1,000 and another of $1,500. The balance is $4,339.34.

The account filed October 7, 1896, shows receipts and deposits in Deshler National Bank and store disbursements, leaving a balance of $133.03. Another account was filed November 16, 1896. This appears to be an executor account, not a mere store account. It gives names of many different persons from whom money was received. But the items are not explained and are not intelligible. It shows an advancement to "R. Westwater" of $1,000. It shows no investments or surplus, that is, no statement is made at all. An account filed December 30, 1897, shows a number of "advancements" to "R. Westwater," and to Robert Westwater, and to Mrs. Hughes. Nothing is stated concerning profits or business. An account filed November 16, 1905, shows merely bank deposits and nothing concerning investments.

The accounts are unsatisfactory and not in good form and do not disclose the condition of the estate.

They are of such character as to impart no knowledge of the condition of the estate or its value. No record or evidence has been offered of the amount of money invested in the graveyard property, of the amount of rents derived therefrom. Nothing appeared in the accounts concerning the large investments in bank stock.

A showing was made on behalf of plaintiff with a view of proving that at the time James Westwater executed his quit-claim and assignment that the amount his father had advanced to him and the value of the Oak street property attempted to be transferred to him was as much as his share was worth. But this fails to meet the fact that no adequate information was furnished.

## 11.   LEGAL DUTY AND EFFECT OF CONDUCT OF THE EXECUTOR IN QUIT-CLAIMS AND ASSIGNMENTS.

The legal obligation of an executor or trustee in dealing with the subject of his trust, springs from the conscience of man, being founded on principles of honesty and fair dealing. The duty exacted by law takes into account the mistakes of judgment and

unconscious influence of self-interest of men who have no inten-
tion of wronging another.  We have here the case of a long
period of management of trusteeship by a trusted, honorable
trustee, with the laws prescribing his powers and duties by his
father's will.  These may not have been of the same impelling
force as would the laws of the state have been upon his mind;
human self-interest for the interests of beneficiaries played an
important part.  New conditions not contemplated or forseen
by the testator had arisen.  This operated on the desires con-
trary to the law of the will.  Under the sanctioning influence
of harmonious sisters and brothers interested alike, with a feel-
ing, no doubt, that another brother apparently had little or no
interest because of advancements, while another apparently im-
-provident brother resides in a distant place, one can perceive
how the most upright person, who has an equal interest in the
subject of the trust, who is given full power in its management
and control, and under strained feelings between beneficiaries,
may unconsciously be partial to his own interest and of his duty.

The fidelity and business acumen of the executor in the admin-
istration of the trust produced results of great advantage to the
estate.  These the father contemplated for the good of each and
all of his sons and daughters, and their legal representatives.  It
was not intended that either should have the advantage.  Of
course the testator did not intend that the trust was to be con-
ducted as it was, but it was intended to be for the equal benefit
of all, whether one had a goodly share of his part before or after
the father's death, or whether one was improvident or otherwise.
It was intended that the accumulations and the value thereof
were to be for the equal benefit of all.  It was not intended that
if the management was successful and a goodly estate should
be builded up and preserved, so that if it was advantageous to
preserve and keep the estate intact and not in accord with the
plan of the testator, that each and all of the beneficiaries should
not equally participate and share the benefits.  Each of the bene-
ficiaries should have had the privilege of electing to retain his
interest, whatever it was, in the estate, in the condition in which
it was, if it was deemed best for all to depart from the plan of
the testator, and the law of the will.

By reason of the conduct of the administration of the trust they were not all treated alike, and they were not given the chance of exercising a choice, if the law of the will was to be departed from. All information was not given to each and all of the beneficiaries by the executor, but his plan and administration was accepted by some with trust, confidence and acquiescence, while others under the disadvantage of inequality of position and lack of information were not in a position to have or exercise a choice.

The plan of the testator was to keep the estate intact until a definite period; if changed conditions and profits from the business expended on the realty made it grow in value, those who had received large advancement had their proportionate interest in it. When asked to relinquish his rights, the executor should have communicated to him all the information that would have enabled him to exercise an intelligent choice.

If there be feeling of contentment with the conditions of the real estate, or the business, giving rise to a desire to disregard the plan of the will, and not to sell out the property and divide it according to the term of the will, such plan may only be carried out by imparting full information to and knowledge of any whose interest it may be the desire to purchase.

Lord Hardwicke more than a century ago declared: "The court looks with jealous eyes at the trustee purchasing of the *ccstui que trust.*" (8 Ohio, 58.)

Wood, J., in *Welsh* v. *Perkins,* 8 Ohio, 52, 56, quotes with approval from Chancellor Kent in *Davoue* v. *Fanning,* 2 Johns Ch., 262, as follows:

"Whether a trustee buys in for himself or his wife, the temptation to abuse is nearly the same. *His interest interferes with his duty.* * * * If a trustee, acting for others, sells an estate, and *himself* becomes the purchaser, or interested in the purchase, the *ccstui que trust* is entitled to come here, *as of course,* and set aside the purchase."

Wood, J., says of the rule:

"It is salutory and necessary to repress fraud and circumvention."

Wood, J., further quoting Chancellor Kent, states:

"A trustee can gain no advantage to himself to the detriment of those for whom he holds the trust. The most frequent application of this doctrine is in cases in which the trustee purchases the subject of his trust. In such cases equity will vacate the sale. The objects of the rule are to secure fidelity on the part of the trustee and preserve the interests of those whose rights are confided to his care."

Wood, J., on his own account, states:

"The rule, in all cases cited, receives our warmest approbation as a well-settled salutory principle in equity, that where *interest and duty conflict, the former must yield and give place to the latter.*"

Johnson, J., in *Pratt* v. *Longworth*, 27 O. S., 159, 195, speaking of a trustee acting in such dual capacity, states:

"He is engaged in serving two masters, when good faith demands that he shall serve but one. His position was one demanding the utmost good faith—the *uberrima fides* of the Roman law. It is a salutory and sound principle that agents to sell can not be purchasers; that the character of seller and buyer are so entirely incompatible that they never can be united in the same person; and generally, that trustees of every description, who have the power to sell, can not, by direct or indirect means, become the purchasers of trust property. *In such cases the court well not suffer itself to be drawn aside from the application of this equitable rule by any attempt on the part of the purchasers to establish the fairness of the purchase, because of the danger of imposition and the presumption of fraud, inaccessible to the eye of the court.*"

"The *cestui que trust* may deal with his trustee, so that the trustee may become purchaser of the estate. But, though permitted, it is a transaction of great delicacy, and which the court will watch with utmost diligence, so much so that it is hazardous for a trustee to engage in such a transaction." Lord Eldon in *Coles* v. *Threethic,* 9 Ves. J. R., 234, quoted 115 Am. St., 24.

Such a transaction is by weight of authority and reason, concededly not void, but merely voidable at the election of the *cestui que trust.*

The following appears to be the most complete and luminous statement of the rule:

"The trustee shall not take beneficially by gift or purchase from the *cestui que trust*;  *  *  *    *the question is not whether or not there is a fraud in fact; the law stamps the purchase by the trustee as fraudulent per se, to remove all temptation to collusion and prevent the necessity of intricate inquiries, in which evil would often escape detection, and the cost of which would be great.*  The law looks only to the facts of the relation and the purchase. The trustee must not deal with the property for his own benefit.  *  *  *

"But, there are exceptions to the rule, and a trustee may buy from the *cestui que trust, provided there is a distinct and clear contract, ascertained after a jealous and scrupulous examination of all the circumstances*; that the *cestui que trust* intended the trustee to buy, and there is a fair consideration *and no fraud, no concealment, no advantage taken by the trustee of information acquired by him in the character of trustee.  The trustee must clear the transaction* of every shadow of suspicion.  *  *  *  Any withholding of information, or ignorance of the facts, or of his rights on the part of the *cestui que trust,* or any inadequacy of price, will make such purchaser a constructive trustee." *Perry on Trusts,* Section 195; *Reeder v. Meredith,* 78 Ark., 11; 115 Am. St., 22; *Woerner Admn.,* Section 487, *et seq.*; *2 Pomeroy's Eq.,* Section 958.

Some loose expressions by courts and text-writers seem to warrant the assumption that a purchase is void at all times, and under all circumstances, but the weight of authority is to the contrary. *Shelby v. Creighton,* 65 Neb., 485; 101 Am. St., 630; *Hammond v. Hopkins,* 143 U. S., 224; *VanDyke v. Johns,* 1 Del. Ch., 93; 12 Am. Dec., 76; *Litchfield v. Cudworth,* 15 Pick., 23; *Munn v. Burgess,* 70 Ill., 604; *Boyd v. Blankman,* 29 Cal., 19; — Am. Dec., 493; *Foxworth v. White,* 72 Ala., 224; *In Re Patterson* (N. Y.), 20 Atl., 486; *Morgan v. Fisher,* 82 Va., 417; *Helms v. Pabst Brew. Co.,* 93 Wis., 153; 57 Am. St., 899; *Houston v. Bryan,* 78 Ga., 181; 6 Am. St., 252; *Comegy v. Emerick,* 134 Ind., 148; 39 Am. St., 245; *Linman v. Riggins,* 140 La. Ann., 761; — Am. St., 549; *Mason v. Odum,* 210 Ill., 47; 102 Am. St., 180.

The fact that it may appear that the beneficiary was of sound mind, and understood the nature and effect of the contract is of

no avail unless it is made to appear that he had full information and complete understanding of all the facts concerning the property and the transaction itself, as much as did the trustee, the executor with whom he was dealing. It must appear that the trustee made to the beneficiary a perfectly honest and complete disclosure and information concerning the estate, the extent, condition and value thereof. *Ludington* v. *Patton*, 111 Wis., 208. See *Caldwell* v. *Caldwell*, 45 O. S., 512.

It is clearly and convincingly established:

1. That the plaintiff, upon whom the burden is, failed to prove that full information was made to either Robert or James.

2. The surplus or profits of the business was not made known.

3. The value and condition of the stock was not disclosed.

4. The profit-sharing partnership contract with employees was not made known to them.

5. The amount of profits or surplus invested in the graveyard property was not made known.

6. The income from the graveyard property was not made known.

7. The investment in bank stock and the amount thereof was not made known.

8. The amount of the unauthorized or ratified advancements was not made known.

9. The fact that Robert had quit-claimed and assigned to all was not made known to James.

The brief of counsel for plaintiff concedes that Robert "got within a few thousand dollars of one-sixth of what was in the estate at that time."

It is not shown by clear and convincing proof that James received the reasonable value of his share, this duty devolving on plaintiff.

On the contrary, in addition to the material facts not made known to him, James and Robert had no opportunity to make a "jealous and scrupulous examination of all the circumstances," they were not made acquainted with all the facts so that there could have been a full understanding of their rights so that they could make "a distinct and clear contract." They were not sufficiently informed so that they, too, could exercise a choice

of retaining an interest in the real estate as it had been improved with the money of the estate.

It will not do for the plaintiff or for counsel to argue that there would have been no estate for any of them had it not been for the skill of the executor in its management.  The testator named him for that purpose; he provided for his compensation, which he did not have to accept if he did not so desire.  But he was to manage it for the benefit of all the beneficiaries.

He was arbitrary in his management, disregarding the provisions of the will in material respects.  His individual negotiations to obtain the assignment of Robert and James, like other of his acts, were in disregard of the will.  His acts in obtaining such releases or assignments, together with the fact that he made a will devising his contingent interest in the estate to John and his two sisters, disclose his partiality and favoritism, which shows reasons for his acts.

One may imagine that he might reason with himself that he had kept the business going; that he had made it successful, and had made the estate valuable, and that James and Robert had had no part in it; that James had had his share even before his father's death; that Robert was far away and not successful and constantly importuning for money, while he and John did the work, and the other two were sisters, to be favored as women are.

The answer to such a view is that that was his father's will; and if he followed it in one respect he should follow it in all respects.  He had no right in equity to disregard the terms of the will, which he so materially did, without the express consent of the devisees and the sanction of the court.

The manner of preparing the account has much to do with the equities between the complaining beneficiaries and the executor and the other beneficiaries.  They did not comply with the law in some respects.

The agreement of March 30, 1900, was in the nature of a ratification of past irregularities, but may not be considered to have authorized the quit-claims and assignments that followed.

Much stress is laid on the fact that objection was not made until the lips of the executor are sealed.  The trustee should have

filed accounts which would have shown the true condition of the estate, and should have submitted the question of the departure from the will to the court before making distribution to beneficiaries. The present unfortunate situation might have been avoided.

The executor seemed never to have realized that he was trustee for *all contingent* interests; he thought of no interests except the living; he did not contemplate the consequences of death.

In conclusion, it is apparent that the instruments of writing, quit-claim deeds, agreements and releases, have no force and effect at law; that they may only be considered in equity by way of estoppel between the survivors.

As to the instruments executed by James, the situation is different. He survived all contingencies and they may, if fair and reasonable, and free from fraud, be given effect against him.

But the court finds that they may not be considered valid in equity as releases of the contingent executory interests because:

1. There was concealment. 2. Advantage was taken by the executor of information. 3. The transactions are not free from suspicion. 4. Information was withheld. 5. There was ignorance of the releasing beneficiaries. 6. There was a failure to file accurate or sufficient accounts. 7. Consent and ratification of material departures from the will was not given with knowledge. 8. The executor and the beneficiaries favored by him gained a material advantage over the two who executed the releases. 9. The individual interest of the executor interfered with his duty, and he would have profited by his acts had he lived. 10. As it is, those for whom he acted in obtaining the releases will have an apparent advantage if the same are upheld. 11. If there is an advantage to the beneficiaries in holding the real estate, instead of selling it and distributing the proceeds according to the will, those who executed releases were not given full and equal opportunity of exercising an election.

The court, for the reasons stated, holds the quit-claim deeds and written assignments voidable in equity, and adjudges them null and void.

12. IMPROVEMENT AND RENTAL OF KERR NORTH GRAVEYARD
PROPERTY AND PAYMENT FROM RENTALS TO
ELLA AND CARRIE.

The administrator asks direction as to the validity of the acts of the executor concerning the improvement and rental division with Ella and Carrie. As the property stood after the death of the testator, the same produced a rental of $600 per annum, which was paid to the daughters according to the will. After the improvement of the property $100 per month was paid to each of them. It is not made to appear how much money was invested by way of improving the property. This was not a compliance with the will, and it does not appear that the executor consulted with the beneficiaries or obtained their consent to the new arrangement. But no agreement or consent which gave an undue advantage to any beneficiary would have bound the heirs of Robert. This arrangement, however, should be binding in equity upon those having knowledge, or who acquiesced in it. It is binding upon John, Carrie and Ella, but not upon James or the heirs of Robert.

The conclusion of the court being that James and the children of Robert have a proportionate interest in the estate, it follows that there must be an accounting of the interests. The point made as to the new plan being binding upon Carrie and Ella, was that they having acquiesced in the new plan and a new arrangement, they are equitably estopped from claiming by the strict letter of the will.

The equitable rights of each and all the beneficiaries as they stand now, may only be determined by an accurate accounting of the whole trust and its administration thereof, with careful computations of interest.

The only way that the rights of Carrie and Ella can be accurately adjusted with those of the others, is to make computation of the probable value of their rights according to the condition of property before its improvement, and after the improvement. In this way only may it be determined whether $100 each per month was equitable.

## 13. ADVANCEMENTS.

The administrator asks direction concerning the right of the executor to make advancements, and the validity of the same, and the duties of plaintiff and the rights of the parties in connection with the payments.

Under the law of the will and the "law of the land" the executor had no legal right to make such arrangement, or to make such payments. And the beneficiaries themselves had no right to make an agreement between themselves which could be binding upon the children of a beneficiary dying before the widow.

The agreement of March 19, 1900, recites that the benficiaries had requested advancements of a portion of their shares at different times, and prevailed on the executor to advance them money at different times. It recited that each of them was fully aware of the provisions of the will relative to "the distribution and settlement of said estate." It was to operate by way of consent and release, and to relieve the executor, as such, and as an individual from any liability.

If all the conditions and facts were made known to each and all of them; if the precise interest of each were made known, then it may be considered as equitably binding upon all who survived the widow and whose interests became vested. It may not be held effective so far as the interests of David and Robert, which go to the children of Robert. If the agreement was entered into with full knowledge, without constructive fraud, then it will operate to equitably estop James, John, Carrie and Ella from claiming their proportionate share of that which David "advanced" to himself, provided they knew that he had paid himself the sum of $20,064.42. By this agreement, John, Ella and Carrie are estopped from claiming any part of that which each received. If James had full knowledge of all the facts, he is estopped from claiming any interest in the $19,955.60 paid to Robert, the $19,215.97 to John and the $14,531.40 to Carrie and the $20,130.25 if made prior to March, 1900. He is not bound by this document, unless he was fully advised.

As the agreement of March, 1900, had no apparent reference to "advancements" to David himself, I am of the opinion that

none of the parties are estopped from claiming their one-sixth
interest in his estate irrespective of the amount of money he paid
himself, unless it be shown by evidence that they actually knew
he had paid himself money and acquiesced in it.  This agree-
ment, by its specific  terms, had relation only to advancements
made prior to its execution.  It does not specifically agree to or
authorize advancements subsequent to its date.  It is agreed and
reiterated, in addition to the receipts, that the several sums of
money advanced is to be deducted from their shares:  ·

"We, the undersigned, therefore being of sound mind and
memory, each of us fully realizing that any and all of said ad-
vancements, of every kind and description, heretofore made,
*or that may hereafter be made* to each of and all of us have been
so made, and so advanced to us for our own good and for our
own benefit, and for the benefit of our own individual estate, and
not only for the benefit of ourselves, but for the benefit of our
heirs, executors, administrators and assigns."

The parenthetical words, "or many hereafter be made" should
not be held to be binding in equity to future or subsequent de-
partures from the will in the way of distribution.

The $5,350 advanced by the testator to Robert and the
$25,299.70 to James, are binding.  None of the "advancements"
are binding on the children of Robert excepting those made by
the testator.  The children of Robert are entitled to one-fifth
of the whole estate, and James, John, Ella and Carrie are en-
titled to one-fifth of the estate.

The estate of David, the executor, is liable for the moneys
paid to himself and to Robert, to the children of Robert.  In
computing the interest going to the children of Robert all "ad-
vancements" should be counted in as part of the estate, together
with interest, except that interest is not to be computed on
advancements made by the testator.

In computing the interest of John, Ella and Carrie, the "ad-
vancements" made them with interest is chargeable to them.

James is entitled to one-fifth of the estate, but is estopped
from claiming anything on account of the "advancements" rati-
fied by the agreement of March, 1900, with his knowledge and

acquiescence. He is not entitled to hold title to the Oak street property; the deed to him by David, John, Carrie and Ella is declared null and void.

The "advancements" made by the present administrator to Ella, $12,515.98; to Carrie, $12,452.72, and to himself of $12,452.70, totaling $37,421.40, were made without authority of law and must, of course, be taken into account in arriving at the total amount of the estate. These payments, of course, were made under the impression that no one had any interest in the estate but the three persons named.

No more definite conclusion concerning these matters can be made without further evidence and an accurate accounting. Further evidence will have to be taken concerning the Oak street property in order to dispose of that question of its use by James. The court might, however, conclude that the agreement of March, 1900, is not binding upon James, because the burden is upon the plaintiff to show that he did have knowledge. But a definite conclusion will not be made on this matter without further hearing.

## 14.  ESTOPPEL OF LACHES.

It is claimed that the cross-petitioners are estopped from seeking the relief which they ask. A complete answer to such claim is that there can be no estoppel without full knowledge. If one be ignorant of his rights, whether of fact or law, there can be no estoppel (*Brown* v. *Sutton*, 29 U. S., 238, 249; *Hammond* v. *Hopkins*, 133 U. S., 24). The burden is on the trustee to show knowledge.

The reason for declaring the releases by James to be null and void was because of his ignorance of essential facts relating to the estate and his interest therein. It must follow that he can not be estopped. Mere lapses of time will not constitute laches. I am familiar with the decision of Bigger, J., in *Peters* v. *Firestone* concerning laches or estoppel. It applies to this case.

I have considered the instruments of release by James as voidable. But this is not true of those by Robert, and of the quit-

claim by David to James. These are void. There can be no estoppel under such conditions.

Ten years have elapsed since James executed the instruments, but no statute of limitation applies to this cross-petition. He had no vested right until after the death of his mother. The only way the instrument may be vitalized is by the equitable doctrine of estoppel. So finding the equities in his favor ends that.

It has been decided that a contract of an heir to release his expectancy in an estate is not, however, enforcible until the death of the ancestor, and no cause of action accrued thereon until that time. *Clendening* v. *Wyatt*, 54 Kan., 523.

### 15.    PARTNERSHIP AGREEMENT FOR CONDUCT OF STORE, MARCH 2, 1908.

The contract made by the executor for the conduct of the business in the form of a partnership agreement with the clerks in the store must, under the conclusion reached in this decision, be held to be unauthorized, and therefore null and void. This was after the instruments had been obtained from Robert and James.

The interests of the beneficiaries in the business or profits thereof may only be ascertained on an accounting.

### 16.    OTHER MATTERS.

An accounting should be taken of the store business up to the time it was closed out.

The business, if not now closed out, should be sold and closed up.

While the executor had no authority to borrow money to improve the realty, still, having done so and the beneficiaries having received the benefit of it, the $36,000 borrowed should be paid by the estate.

If the payments to the widow in their total equalled the amount to which she would have been entitled under the will, they may be confirmed without regard to how and in what amounts they were paid.

### 17. Power of Administrator de bonis non to Sell Real Estate.

The rule in respect to a power conferred by will upon an executor to sell real estate and to make deeds is that when the same appears to be purely personal, an administrator with the will annexed does not have such power, but must obtain an order of the sale from the court. If the power is annexed to the office and part of the trust, it passes to the administrator.

The power conferred by the will is regarded as purely personal, and the opinion and decision is that the present administrator does not have the power to sell the real estate without an order of court.

It is apparent that a final decree can not be rendered in this case without taking further evidence and perhaps without an accounting so as to determine the respective interests of the beneficiaries.

Final decision is not now made concerning the binding character of the agreement of March, 1900, upon James, nor in respect to the Oak street property. Nor can decision be made respecting the amount paid to the sisters from the graveyard property, as before stated.

The accounting would have relation specifically to the business, investments and real estate. But I am not sure that an accounting, as the case now stands, would be entirely proper; so no order will be made unless it may be shown to be desirable or advisable.

It may be that the essential points concerning the interests of the beneficiaries having been determined that is all that need be decided in this proceeding.

A decree may be drawn and entered embracing the findings and conclusion contained herein.